UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 11-20167-CR-JORDAN/O'SULLIVAN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

MANUEL LABRADA,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court on the Defendant Manuel Labrada's Motion to Suppress Evidence Seized Without a Warrant on February 11, 2011 and All Evidence Obtained on the Basis of Such Evidence and Memorandum in Support (DE# 48, 5/20/11). Having held an evidentiary hearing on August 23, 2011 and carefully considered the applicable filings and the law, the undersigned respectfully recommends that the Defendant Manuel Labrada's Motion to Suppress Evidence Seized Without a Warrant on February 11, 2011 and All Evidence Obtained on the Basis of Such Evidence and Memorandum in Support (DE# 48, 5/20/11) be **DENIED** for the reasons stated herein.

## BACKGROUND

The defendant is charged by superceding indictment with conspiracy to commit access device fraud, in violation of Title 18, United States Code, Section 1029(b)(2), use of or trafficking in counterfeit access devices in violation of Title 18, United States Code, Section 1029(a)(1), possession of 15 or more unauthorized or counterfeit access devices in violation of Title 18, United States Code, Section 1029(a)(2) and aggravated

identity theft in violation of Title 18, United States Code, Section 1028A(a)(1). <u>See</u> Superceding Indictment (DE# 52, 5/31/11).

On May 20, 2011, the defendant filed the instant motion to suppress. <u>See</u> Defendant Manuel Labrada's Motion to Suppress Evidence Seized Without a Warrant on February 11, 2011 and All Evidence Obtained on the Basis of Such Evidence and Memorandum in Support (DE# 48, 5/20/11). The government filed its response on June 7, 2011. <u>See</u> Government's Response Opposing Defendant Manuel LaBrada's Motion to Suppress Evidence (DE# 56, 6/7/11). The defendant did not file a reply brief.

On August 23, 2011, the undersigned held an evidentiary hearing. The undersigned admitted into evidence Government's Exhibits 1 through 11. The defendant did not seek to admit exhibits. The government presented the testimony of Special Agent Michael Schnaider, Detective Ivette Perez and Detective Joaquin Garcia-Tuñon. The defendant called Officer Christopher Candido Rivera and testified on his own behalf. Following the evidentiary hearing, the undersigned allowed the government and the defendant to submit supplemental briefs on inevitable discovery and the plain view doctrine. <u>See</u> Order (DE# 74, 8/23/11). On August 30, 2011, the government filed its supplemental brief. <u>See</u> Supplemental Government's Response Opposing Defendant Manuel Labrada's Motion to Suppress Evidence (DE# 78, 8/30/11). On September 2, 2011, the defendant submitted his response. <u>See</u> Defendant Manuel Labrada's Reply to Supplemental Government's Response Opposing Defendant Manuel Labrada's Motion to Suppress Evidence (DE# 80, 9/2/11). This matter is now ripe for consideration.

2

## **FINDINGS OF FACT**

In February 2011, United States Secret Service Special Agent Michael N. Schnaider and Miami-Dade Police Detective Ivette Perez were investigating unauthorized credit card use at South Florida gas stations. Special Agent Schnaider and Detective Perez visited numerous gas stations in an attempt to obtain video of the fraudulent transactions. Special Agent Schnaider and Detective Perez obtained video footage from a BP gas station in Miami Lakes, Florida. The video showed a blue semi-truck pulling up to the gas station. The truck parked at one of the gas pumps. A man (later identified as the co-defendant Mazuki Lopez) exited the truck and spent approximately 45 minutes at the gas pump. The man used multiple counterfeit credit cards to fill up the truck. Special Agent Schnaider asked the owner/manager of the BP gas station to call him if the man returned to the gas station.

The next day, the BP gas station manager called Special Agent Schnaider to report that the man had returned to the gas station. After receiving this call, Special Agent Schnaider called Detective Perez and told her that the man was at the BP gas station. Detective Perez called Miami-Dade Police Dispatch to send a marked police vehicle to the BP gas station.

Officer Christopher Candido Rivera was the first to arrive on the scene.[1] Officer

---

[1] Special Agent Schnaider testified that when he arrived at the gas station Officer Rivera was already there. See Transcript (DE# 77 at 19, 8/27/11). Officer Rivera testified that he arrived at the gas station seconds after Special Agent Schnaider had arrived. Id. at 102. A report indicated that Special Agent Schnaider and Officer Rivera arrived simultaneously at 3:35 PM. Id. at 76-77. The undersigned finds that this is a minor discrepancy that does not affect the credibility of Special Agent Schnaider and Officer Rivera.

Rivera was in a marked police vehicle. Special Agent Schnaider arrived as Officer Rivera was exiting the marked police vehicle. Detective Perez arrived approximately ten minutes after Special Agent Schnaider.

Upon arrival, Special Agent Schnaider observed a blue semi-truck parked at a gas pump and a white SUV parked adjacent to the truck. As Special Agent Schnaider approached the vehicles he saw two men standing behind the white SUV with their backs to Special Agent Schnaider. The men were later identified as the defendant and the co-defendant, Mazuki Lopez.

Special Agent Schnaider approached the men and identified himself. He asked the men to sit down on the curb. After the men sat down, Special Agent Schnaider identified himself again and told the men that he was there in reference to a credit card fraud investigation. Special Agent Schnaider asked the men who owned the blue semi-truck. Co-defendant Mazuki Lopez stated that he was the owner of the semi-truck. Special Agent Schnaider asked the men who owned the white SUV. Mr. Lopez responded that he was also the owner of the white SUV. Mr. Lopez stated that he was driving the semi-truck and that the defendant was driving the white SUV.

Special Agent Schnaider told the men that he knew counterfeit credit cards were being used to purchase gasoline and asked where the counterfeit cards were. Mr. Lopez gestured to a fanny pack around his waist indicating that the credit cards were in his fanny pack. Special Agent Schnaider asked Mr. Lopez if the counterfeit credit cards were in the fanny pack and Mr. Lopez said "yes." At that point, Special Agent Schnaider told Mr. Lopez to stand up and turn around. Special Agent Schnaider handcuffed Mr.

4

Lopez and sat him back down on the curb.[2] Special Agent Schnaider opened the fanny pack and discovered two bundles of credit cards. Special Agent Schnaider looked through the credit cards and noted that the majority of the cards had writings in black marker on them. The writings denoted amounts, zip codes and pin numbers. They were also in the names of multiple individuals. One of the cards was in the name of an individual with the surname "Burgos." The defendant's name, "Manuel Labrada" also appeared embossed on some of the counterfeit credit cards found in Mr. Lopez's fanny back.[3] Mr. Lopez also had a Bank of America card which bore a picture of the defendant. See Transcript (DE# 77 at 58-59, 8/27/11).

Special Agent Schnaider asked Mr. Lopez if he could search his vehicles. Mr. Lopez consented to the search of both vehicles in the presence of the defendant. The defendant did not object to Mr. Lopez's consent. Special Agent Schnaider asked if there were any guns or drugs in the vehicles. The defendant indicated that there was a gun in

---

[2] The defendant testified that Special Agent Schnaider handcuffed the defendant immediately after he handcuffed co-defendant Lopez. The undersigned does not find this testimony credible. See United States v. Boulette, 265 Fed. Appx. 895, 898 (11th Cir. 2008) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder is in a better position than a reviewing court to assess the credibility of witnesses.'"). The undersigned notes that the defendant is facing a term of imprisonment if convicted and has an interest in testifying favorably. The undersigned credits the testimony of Special Agent Schnaider that he handcuffed the defendant after the defendant indicated that there was a firearm in the SUV over the testimony of the defendant that the defendant was handcuffed immediately after co-defendant Lopez.

[3] Special Agent Schnaider did not know the defendant's name was on some of the credit cards found in co-defendant Lopez's possession at the time he searched the defendant's wallet.

the white SUV between the driver's seat and the center console. For officer safety,[4] Special Agent Schnaider handcuffed the defendant before he proceeded to retrieve the firearm from the SUV.

The back hatch of the SUV was already open. Inside the SUV was a box depicting a flat screen television. Special Agent Schnaider observed laptop computers in plain view.[5] Special Agent Schnaider retrieved the firearm from the SUV. The firearm was between the driver's seat and the center console. <u>See</u> Government's Exhibit 10.[6]

After retrieving the firearm, Special Agent Schnaider asked the defendant if he had a concealed weapons permit and identification. The defendant said "yes."[7] Special Agent Schnaider asked the defendant where those documents were. The defendant

---

[4] Special Agent Schnaider was concerned that the defendant might have a firearm on his person. Special Agent Schnaider did not do a pat down of the defendant.

[5] At some point on the date of the arrest, Special Agent Schnaider asked the defendant about the laptop computers. The defendant indicated they were his computers.

[6] The defendant testified that Special Agent Schnaider searched the SUV first. He did not find anything. After Special Agent Schnaider searched the SUV, the defendant told Special Agent Schnaider about the firearm between the driver's seat and the center console. For the reasons stated above, the undersigned credits Special Agent Schnaider's testimony over the testimony of the defendant.

[7] Special Agent Schnaider does not speak Spanish. The defendant testified that he did not speak English and as a result he could not communicate with Special Agent Schnaider. The undersigned does not find the defendant's testimony that he does not speak English credible. The defendant testified through the aid of a Spanish interpreter. However, the defendant was at times able to respond to the prosecutor's questions before the interpreter had an opportunity to translate them. Additionally, on direct examination the defendant was able to relay to his attorney the communications that took place between Special Agent Schnaider and co-defendant Lopez. These conversations were in English. The undersigned credits Special Agent Schnaider's testimony that the defendant understood Special Agent Schnaider's questions and directives.

motioned with his head towards his back. Special Agent Schnaider asked the defendant if the documents were in his wallet. The defendant responded "yes." Special Agent Schnaider then stated, "[b]efore I go inside your . . .  pocket, do you have any sharp objects that I might poke myself with or harm myself with." Transcript (DE# 77 at 26, 8/27/11). The defendant responded "no." Special Agent Schnaider reached into the defendant's back pocket and retrieved the defendant's wallet.

Special Agent Schnaider opened the wallet and immediately saw a stack of approximately six credit cards in the billfold compartment of the wallet where paper currency is normally kept. This caught Special Agent Schnaider's attention because based on his experience and training, Special Agent Schnaider knew that fraudulent credit cards are generally kept separate from an individual's authentic credit cards. Special Agent Schnaider saw that the first card had the same black markings as the cards in Mr. Lopez's fanny pack.[8] The defendant also had a card with the name "George Burgos" on it. The same name as the card found in Mr. Lopez's fanny pack.

Special Agent Schnaider continued to look through the defendant's wallet because he had determined that the credit cards were counterfeit. Transcript (DE# 77 at 58, 8/27/11). Special Agent Schnaider found the defendant's driver's license and learned that the defendant's name was Manuel Labrada, the same name that appeared

---

[8] Special Agent Schnaider testified that as soon as he opened the wallet he saw the stack of credit cards in plain view. The defendant testified that the credit cards in the billfold section of the wallet were not visible. At the August 23, 2011 evidentiary hearing, the defendant presented a wallet. The wallet was arranged in the same manner in which the defendant carried his wallet on the date of his arrest. Inside the billfold section of wallet were six credit cards. The undersigned viewed the wallet and determined that although Special Agent Schnaider could have seen the tops of the credit cards he would not have been able to see the black markings on the first credit card unless he pulled open the billfold section of the wallet.

embossed on some of Mr. Lopez's counterfeit credit cards.[9] Special Agent Schnaider also located the defendant's concealed weapon's permit around the same time as he found the defendant's driver's license.

Special Agent Schnaider was at the gas station for approximately four to four and a half hours. Part of the delay was caused by the Department of Transportation. Special Agent Schnaider discovered that the numbers displayed on the truck were false. The truck's true numbers were covered up by a magnetic strip displaying a different set of numbers. Special Agent Schnaider contacted the Department of Transportation to obtain assistance in determining the truck's true identity. The Department of Transportation arrived approximately an hour after it had been contacted. The Department of Transportation remained at the gas station for approximately another hour before citing Mr. Lopez for several violations. Law enforcement also requested assistance to tow the two vehicles. The laptops were seized and both vehicles were impounded.

The defendant and Mr. Lopez were subsequently transported to the Miami-Dade Police Headquarters. In a post-Miranda statement, co-defendant Lopez stated that the defendant had approached Mr. Lopez because Mr. Lopez had a truck. The defendant provided Mr. Lopez with counterfeit credit cards. The scheme was to fuel the truck using the counterfeit credit cards. The defendant and Mr. Lopez would then siphon the fuel and sell it. They would split the profits equally.

---

[9] The defendant testified that he carries his driver's license in the front card slot of his wallet and his concealed weapons permit in a slot on the opposite side of the wallet. Special Agent Schnaider testified that he did not recall where in the wallet he found the defendant's license.

The original arrest affidavit sworn to by Special Agent Luke Methot contains an inaccurate statement. It states that when Special Agent Schnaider asked the defendant for identification, the defendant took out his wallet and handed Special Agent Schnaider the identification. When the defendant opened his wallet, Special Agent Schnaider saw the counterfeit credit cards in plain view. Special Agent Schnaider noticed the inaccuracy in the arrest affidavit at the time of the superceding indictment and notified an Assistant United States Attorney. Special Agent Schnaider also informed the grand jury about this mistake.

## DISCUSSION

**A.    Evidence Obtained from the Defendant's Wallet**

   **i.     The Initial Encounter**

The defendant seeks to suppress the evidence obtained from the defendant's wallet on the date of his arrest. <u>See</u> Defendant Manuel Labrada's Motion to Suppress Evidence Seized Without a Warrant on February 11, 2011 and All Evidence Obtained on the Basis of Such Evidence and Memorandum in Support (DE# 48 at 4-5, 5/20/11). The defendant argues that Special Agent Schnaider lacked "probable cause even to detain [the defendant] in the first instance." Defendant Manuel Labrada's Reply to Supplemental Government's Response Opposing Defendant Manuel Labrada's Motion to Suppress Evidence (DE# 80 at 5, 9/2/11).

The Eleventh Circuit has recognized:

three tiers of police-citizen encounters with respect to the fourth amendment: (1) police-citizen communications involving no coercion or detention; (2) brief "seizures;" and (3) full scale arrests. [<u>United States v. Berry</u>, 670 F.2d 583, 591 (5th Cir. 1982)]. The first category of consensual encounters does not implicate fourth amendment scrutiny. <u>Id.</u> The second

9

> category involves reasonably brief encounters in which a reasonable
> person would have believed that he or she was not free to leave.
> Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 104
> S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). In order to justify such a fourth
> amendment "seizure," the government must show a reasonable,
> articulable suspicion that the person has committed or is about to commit
> a crime. Florida v. Rodriguez, 469 U.S. 1, 105 S.Ct. 308, 310, 83 L.Ed.2d
> 165 (1984). Finally, when the totality of circumstances indicate that an
> encounter has become too intrusive to be classified as a brief seizure, the
> encounter is an arrest and probable cause is required. Florida v. Royer,
> 460 U.S. 491, 499–500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983)
> (plurality opinion).

United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986). In the instant

case, Special Agent Schnaider had reasonable suspicion to briefly detain the defendant

under Terry v. Ohio, 392 U.S. 1, 21 (1968). A Terry stop does not require probable

cause. Id. A Terry stop meets constitutional standards if the officer had a reasonable

suspicion of criminal activity, based on articulable and specific facts known to him when

the stop occurred. United States v. Thompson, 712 F.2d 1356, 1361 (11th Cir. 1983).

Although this standard is considerably less demanding than probable cause, the Fourth

Amendment nevertheless requires that the police officers articulate facts which provide

some minimal, objective justification for the stop. United States v. Sokolow, 490 U.S. 1

(1989). Here, Special Agent Schnaider had reasonable suspicion of the defendant's

involvement in criminal activity. When Special Agent Schnaider arrived at the gas

station, he observed a truck parked at a gas pump and two men standing together next

to the truck. It was obvious the two men were acquainted. Special Agent Schnaider

recognized the truck from the video and knew that the truck's gas tank had recently

been filled using counterfeit credit cards. Special Agent Schnaider also recognized one

of the men from the video. These facts taken together would have provided Special

Agent Schnaider with reasonable suspicion that the defendant was part of the counterfeit credit card scheme. The fact that Special Agent Schnaider placed the defendant in handcuffs for officer safety after the defendant admitted to the presence of a firearm in the vehicle he was driving, did not transform a <u>Terry</u> stop into an arrest. <u>See</u> <u>United States v. Gil</u>, 204 F.3d 1347, 1350-51 (11th Cir. 2000) (<u>Terry</u> stop did not ripen into an arrest when officers handcuffed the defendant and detained her in the back of a police vehicle for seventy-five minutes for the safety of the officers and the ongoing investigation).

**ii.    Consent to Search the Wallet**

The undersigned further finds that the defendant consented to Special Agent Schnaider's search of his wallet for purposes of obtaining identification and a concealed weapons permit. In <u>United States v. Chrispin</u>, 181 Fed. Appx. 935 (11th Cir. 2006) (<u>per curiam</u>), the Eleventh Circuit affirmed an order denying a motion to suppress where the defendant provided non-verbal consent to a search of his person. The Eleventh Circuit noted that:

> although [the defendant] did not express his verbal assent to be searched, his body language – turning away from [the police officer] and placing his hands on the police cruiser as if preparing to be searched – gave implied consent. There is no evidence that his decision to do so was not freely made or without constraint. Accordingly, we conclude that [the defendant] voluntarily consented to be searched.

<u>Id.</u> at 939.

Similarly here, the defendant provided non-verbal consent to the search of his wallet for identification and a concealed weapons permit. In the instant case, Special Agent Schnaider asked the defendant if he had a concealed weapons permit and

identification. The defendant said "yes." Special Agent Schnaider asked the defendant
where those documents were. The defendant motioned with his head towards his back.
Special Agent Schnaider asked the defendant if the documents were in his wallet. The
defendant responded "yes." Thus, the defendant provided Special Agent Schnaider with
consent to search his wallet for identification and a concealed weapons permit through
his non-verbal gestures and responses to Special Agent Schnaider's questions. See
also United States v. Livingston, No. 10-6192, 2011 WL 2678586, at *3 (10th Cir. Jul.
11, 2011) (stating that "[w]hile she did not expressly tell the officers to come in, [the
occupant of a motel room]'s 'non-verbal conduct' in pointing to the closet and stepping
out of the bedroom constituted a voluntary consent to search."). Notably, the defendant
did not object when Special Agent Schnaider indicated that he was going to reach into
the defendant's back pocket and retrieve the defendant's wallet. See Transcript (DE#
77 at 26, 8/27/11) (Special Agent Schnaider asked the defendant, "[b]efore I go inside
your . . .  pocket, do you have any sharp objects that I might poke myself with or harm
myself with [?]" The defendant responded "no.").

        Additionally, the defendant's consent was knowing and voluntary. There is no
evidence that the defendant felt intimidated or coerced in any manner or that Special
Agent Schnaider had drawn a firearm. Although the defendant was handcuffed at the
time he gave his consent to Special Agent Schnaider, the Eleventh Circuit has found
voluntary consent in cases involving a handcuffed defendant and under circumstances
that were much more intimidating than the instant case. See, e.g., United States v.
Garcia, 890 F.2d 355, 360 (11th Cir. 1989). The undersigned concludes that the
defendant provided knowing and voluntary consent and that Special Agent Schnaider

lawfully removed the wallet from the defendant's back pocket pursuant to that consent.

### iii.    Scope of the Search

Having determined that the defendant consented to the search of his wallet, the undersigned must also determine whether Special Agent Schnaider's search of the defendant's wallet was within the scope of the consent provided by the defendant. See United States v. Chrispin, 181 Fed. Appx. 935, 939 (11th Cir. 2006); United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992) (stating that "[t]he government may not exceed the boundaries of the consent, and any evidence gathered beyond those boundaries must be excluded."). "The scope of a consensual search is determined by the terms of the actual consent . . . [and t]he terms of the consent govern the scope of the search in the same manner as the specifications in a warrant." Martinez, 949 F.2d at 1119 (citations omitted).

In the instant case, the scope of the defendant's consent was to allow Special Agent Schnaider to look through the defendant's wallet for identification and a concealed weapons permit. Initially, the government argued that Special Agent Schnaider discovered the credit cards while searching for the defendant's identification and concealed weapons' permit. See Government's Response Opposing Defendant Manuel LaBrada's Motion to Suppress Evidence (DE# 56 at 11, 6/7/11) (stating that "[Special] Agent Schnaider was looking for a driver's license or concealed weapons permit . . . ."). In its supplemental brief, the government takes the position that Special Agent Schnaider's search of the billfold section of the defendant's wallet was within the scope of the defendant's consent because Special Agent Schnaider was looking for identification and credit cards are a form of identification. See Supplemental

13

Government's Response Opposing Defendant Manuel Labrada's Motion to Suppress Evidence (DE# 78 at 1, 8/30/11) (stating that "[s]ince [the defendant] placed no limitations on the means or forms of identification that could be looked for within his wallet, a reasonable officer's search within the billfold of the wallet through credit cards, which are themselves forms of identification, is within the scope of consent."). The government points out that:

> in the context of a counterfeit credit card investigation, where a law enforcement officer had already found numerous counterfeit credit cards in another co-defendant's possession, a reasonable officer seeking to find out the true identity of a suspect would not simply stop at the first form of identification he finds in a wallet, which may very well contain a false name.

Id. at 6. The government further argues that the counterfeit credit cards in the defendant's wallet would have been inevitably discovered as part of a search incident to arrest:

> once [the defendant]'s identity was ascertained, his connection to [co-defendant] Lopez's possession of admittedly counterfeit cards – three counterfeit credit cards in Lopez's possession were embossed with [the defendant]'s name and one in fact featured his photograph – coupled with [the defendant]'s driving of Lopez's car and his rendezvous with him at the scene of a crime, provided probable cause to believe that [the defendant] aided and abetted Lopez in his possession of counterfeit credit cards.

Id. at 2.

The undersigned does not need to address inevitable discovery, because Special Agent Schnaider's search of the billfold section of the defendant's wallet was within the scope of consent. The defendant consented to the search of his wallet for purposes of obtaining his identification and concealed weapons permit. The size and shape of both items are similar to the size and shape of a credit card. The undersigned

finds that when Special Agent Schnaider opened the defendant's wallet the tops of the stack of six cards in the billfold portion of the wallet would have been visible to Special Agent Schnaider. Although Special Agent Schanider would not have been able to see the black markings on the first card without opening the billfold section wider, the tops of the credit cards in the stack could easily be confused with a concealed weapons permit, a driver's license or state-issued identification card. Thus, Special Agent Schnaider was justified in pulling the stack of cards out from the billfold to determine whether they were in fact the defendant's identification or the defendant's concealed weapons permit. Upon pulling the stack of credit cards out, Special Agent Schnaider observed in plain view the black markings which, based on his training and experience, were indicative of fraudulent credit card use.

The fact that the defendant kept his license and concealed weapons permit in the front slots of his wallet is not dispositive, because there is no evidence that Special Agent Schnaider saw the defendant's license and concealed weapons permit and proceeded to pull out the stack of cards anyway. See Transcript (DE# 77 at 56, 8/27/11) (Special Agent Schnaider testified as follows: "[a]s I stated before, the first thing that caught my eye **as soon as I opened the wallet** was a stack of credit cards in the fold.") (emphasis added). In United States v. Whaley, 415 Fed. Appx. 129, 133 (11th Cir. 2011), the defendant consented to allow an officer to view a flight simulator program on his computer. The officer opened a file entitled "auto racing 13" mistakenly believing it to be the flight simulator program even though there was another file entitled "Microsoft Flight Si" visible. Id. The "auto racing 13" file contained child pornography. Id. at 134. The issue in Whaley was "whether an officer exceed[ed] the scope of . . . an

individual's consent to search for a particular computer file when the officer opens another file in the reasonable, though mistaken belief, that it [wa]s the file that was the subject of the individual's consent." Id. The Eleventh Circuit concluded that the scope of consent had not been exceeded:

> [the officer] discovered the child pornography inadvertently while searching, with [the defendant]'s consent, for the flight simulator program. After [the officer] discovered the illicit video, the officer[ ] sought and obtained [the defendant]'s consent before opening any additional programs. Accordingly, . . . the initial opening of the "auto racing 13" icon did not exceed the scope of [the defendant]'s consent.

Id. Similarly here, Special Agent Schnaider discovered the counterfeit credit cards while looking for the defendant's driver's license and concealed weapons permit. The fact that the stack of cards was the first thing Special Agent Schnaider noticed and not the defendant's driver's license and concealed weapons permit in the front slots of the wallet is not surprising. Special Agent Schnaider's experience and training would have made him especially cognizant of a segregated stack of cards.

**B.    The Defendant's Laptops**

The defendant also seeks to suppress the laptop computers recovered from co-defendant Lopez's SUV on the ground that but for the defendant's illegal search and arrest, law enforcement would not have seized the laptops. See Defendant Manuel Labrada's Motion to Suppress Evidence Seized Without a Warrant on February 11, 2011 and All Evidence Obtained on the Basis of Such Evidence and Memorandum in Support (DE# 48 at 9, 5/20/11) (stating that "[b]ecause this further search of [the defendant]'s pocket was constitutionally invalid, the seizure of the credit/gift cards and search of the vehicle and seizure of the laptop computer that followed is likewise

unconstitutional.") (citation omitted).

Here, co-defendant Lopez provided Special Agent Schnaider with consent to search the SUV. The defendant argues that the consent was insufficient because the defendant had dominion and control over the vehicle on the date of his arrest. The undersigned concludes that Mr. Lopez, as the owner of the vehicle, had authority to consent to the search of that vehicle, even though the defendant was the driver of the vehicle. In United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam), the defendant was a passenger in a taxicab. A police officer stopped the taxicab after observing a traffic violation. Id. The police officer obtained consent from the driver of the taxicab to search the passenger compartment of the taxicab where the defendant was sitting. Id. There, the police officer discovered a firearm under the floor mat. Id. The defendant argued that "the cab driver's consent was ineffective because [the defendant] had a superior privacy interest." Id. The Eleventh Circuit rejected this argument:

> Assuming [the defendant] had a legitimate expectation of privacy in the entire passenger compartment, the district court did not err by failing to suppress the pistol because [the police officer] justifiably relied on the cab driver's consent to search the area. Also, although present when the driver consented to the search, [the defendant] never expressed any disagreement with the driver's consent; rather, he remained silent.

Id. at 1339. Similarly here, the defendant was present when Mr. Lopez gave Special Agent Schnaider consent to search the white SUV. The defendant never objected to the search of the SUV. Pursuant to Mr. Lopez's valid consent, Special Agent Schnaider searched the vehicle and observed the defendant's laptops in plain view. Having determined that the owner of the vehicle co-defendant Lopez was in possession of counterfeit credit cards, Special Agent Schnaider was entitled to seize the laptops from

17

Mr. Lopez's vehicle. Special Agent Schnaider would have also been entitled to seize the laptops following the defendant's lawful arrest.[10]

**RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Defendant Manuel Labrada's Motion to Suppress Evidence Seized Without a Warrant on February 11, 2011 and All Evidence Obtained on the Basis of Such Evidence and Memorandum in Support (DE# 48, 5/20/11) be **DENIED**. Pursuant to 28 U.S.C. §636(b)(1)(B) and (c), the parties may serve and file written objections to this Report and Recommendation with the Honorable Adalberto Jordan, United States District Judge, within fourteen (14) days[11] of receipt of a copy of this Report and Recommendation. See Nettles v.

––––––––––––––––––

[10] The defendant argues for the first time in his supplemental brief that the evidence obtained from the laptops should be suppressed based on the government's 28-day delay in obtaining a search warrant to search the laptop. See Defendant Manuel Labrada's Reply to Supplemental Government's Response Opposing Defendant Manuel Labrada's Motion to Suppress Evidence (DE# 80 at 10, 9/2/11) (citing United States v. Mitchell, 565 F.3d 1347, 1350 (11th Cir. 2009)). Because the defendant did not previously make this argument, the facts surrounding the search warrant application were not elicited at the evidentiary hearing and the government has not had an opportunity to respond to this argument. Moreover, the undersigned permitted the parties to submit supplemental briefs only on inevitable discovery and the plain view doctrine. See Transcript (DE# 77 at 149, 8/27/11). Thus, this argument falls outside the permissible scope of the supplemental briefs

[11] Trial in this matter is presently set for the two-week trial period beginning on September 26, 2011. See Order Granting Defendant's Motion for Continuance (DE# 55, 6/1/11). Any objections to this Report and Recommendation must be filed prior to the scheduled trial.

Wainright, 677 F.2d 404 (5th Cir. 1982).

     RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida

this **9th** day of September, 2011.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE


Copies provided to:
United States District Judge Jordan
All counsel of record